Argued and submitted May 5, decision of Court of Apeals is reversed and decision of the trial court is affirmed December 9, 1981

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## PATRICIA ANN NEWMAN,
*Petitioner on Review.*

(TC C 79-10-33601, CA 16600, SC 27594)

637 P2d 143

Nancy R. Walseth, Portland, argued the cause for petitioner. With her on the briefs were Richard A. Van Hoomissen and Cooney & Van Hoomissen, Portland.

Thomas H. Denney, Assistant Attorney General, argued the cause for respondent. With him on on the brief were James M. Brown, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

CAMPBELL, J.

Tanzer, J., filed a dissenting opinion. Tongue, J., and Peterson, J., joined in the dissent.

## CAMPBELL, J.

The narrow issue in this case is: Can the police without a warrant in a noncriminal and nonemergency situation search the property of an intoxicated person for identification at the time the person is taken into custody?

On October 13, 1979, at about 5:30 a.m., Portland Police Officer Kenneth Pacheco saw an automobile parked in a no parking zone on Southeast McLoughlin Boulevard.[1] Both tires on the left side were flat and a person behind the steering wheel was leaning against the window on the driver's side. Pacheco parked the police car behind the disabled vehicle and approached it to investigate. The person behind the wheel was the defendant, who was the sole occupant of the automobile. The officer "knocked on the window a couple of times and got no reaction," so he opened the door and "shook the young lady a couple of times until she finally woke up." As to the next events the officer testified:

> "Basically I asked her — she looked very young and I asked how old she was. She said 22, and I asked if she had any identification and she just kept telling me she wanted to go home, and I continuously asked for identification and she wouldn't — she just kept saying, 'I want to go home,' and I could smell a moderate amount of alcohol on her breath and I assumed she was intoxicated."

Finally, the defendant reached into her purse and gave a driver's license to the officer. The license had been issued to Catherine M. Newman, age 22, with a Milwaukie, Oregon address.

Next, Officer Pacheco asked the defendant for a telephone number so that he could verify her identity. After some delay, she gave the officer a telephone number. He had the East Police Precinct call the number and they reported back that the person answering "had never heard of Catherine Newman or anybody by the name of Newman." The officer then asked the defendant for her parents' telephone number and she replied, "Well, take me wherever you want, but don't call my parents."

---

[1] Our recital of the facts is taken from the transcript of the hearing on the defendant's motion to suppress evidence. Portland police officer Kenneth Pacheco was the only witness to testify at that hearing. The trial judge did not make specific findings of historical fact.

The officer did not think that the defendant was Catherine Newman or that she was 22 years of age. She did not respond to the name Catherine and in the officer's opinion she did not look like the photograph on the driver's license. Her condition and behavior "ranged from being hysterical to crying to being antagonistic and extremely moody."

Officer Davis arrived on the scene and he, with the approval of Officer Pacheco, handcuffed the defendant and placed her in the back of one of the patrol cars. Pacheco placed the defendant in custody "on a civil hold"[2] to take her either to the "detox[3] or the booking facility."[4] He did not intend to charge her with a violation of any law.

After the defendant was placed in the patrol car, Pacheco went back to her vehicle and found a woman's purse on the ground. The purse was closed and he opened it without the defendant's consent for the "sole purpose (of finding out) who she was." When the officer first opened the purse, he found a plastic bag containing white cross top pills. On a further search of the purse he discovered additional pills and a wallet. Inside the wallet was a driver's license issued to Patricia Ann Newman, age 19, with the same Milwaukie address as that listed on the previous driver's license. When confronted with the second driver's license, the defendant admitted that she was Patricia Ann Newman and that Catherine M. Newman was her sister.

The defendant was charged by a two count information with possession of a controlled substance, ORS 475.992, and with misuse of a driver's license, ORS 482.610. The defendant moved to suppress all evidence seized on October 13, 1979, on the ground that it was "unreasonably seized without a warrant and in violation of

---

[2] We do not find the term "civil hold" used or defined in the Oregon Statutes or case law. There is no issue in this case concerning the definition of the term.

[3] ORS 430.306(4) defines a "detoxification center" as a publicly or privately operated nonprofit facility that provides emergency care or treatment for alcoholics. Neither party has contended that the defendant was an alcoholic or needed emergency care.

[4] Later in the hearing, Officer Pacheco testified that when the defendant was arrested on the controlled substance charge, he took her to the "booking facility" on the 7th floor of the Multnomah County Courthouse.

federal and state constitutions, statutes, and case law." The trial court allowed the motion to suppress and when the state declined to proceed to trial, the information was dismissed.

The state appealed to the Court of Appeals pursuant to ORS 138.060(1) and (3). The Court of Appeals reversed and remanded, 49 Or App 313, 619 P2d 930, (1981) holding that it was required to analyze the search on the basis of reasonableness because the standard of probable cause applied only to criminal cases and not to noncriminal situations.[5] The court found the search of the defendant's purse for identification was reasonable under the circumstances.

We disagree with the Court of Appeals that the search of the defendant's purse for identification was reasonable under the circumstances of this case and therefore reverse. The effect of this decision is to reinstate the trial court's order suppressing the evidence.

A person who is intoxicated in a public place may be taken home or to a treatment facility by the police. ORS 426.460(1).[6] If there is no appropriate treatment facility, the intoxicated person may be taken to a city or county jail where the person may be held until no longer intoxicated. ORS 426.460(3). There is nothing in the record to indicate what treatment facilities were available in Multnomah County.

---

[5] The Court of Appeals cited *South Dakota v. Opperman*, 428 US 364, 370 n.5, 96 S Ct 3092, 49 L Ed 2d 1000 (1976) as authority for the proposition that the standard of probable cause applied only to criminal cases and not to noncriminal situations. Because of the result we reach, we find it unnecessary to consider the question.

[6] ORS 426.460(1) provides as follows:

"Any person who is intoxicated or under the influence of controlled substances in a public place may be taken or sent home or to a treatment facility by the police. However, if the person is incapacitated, the health of the person appears to be in immediate danger, or the police have reasonable cause to believe the person is dangerous to self or to any other person, the person shall be taken by the police to an appropriate treatment facility. A person shall be deemed incapacitated when in the opinion of the police officer or director of the treatment facilty the person is unable to make a rational decision as to acceptance of assistance."

The officer could smell a moderate amount of alcohol on the defendant's breath and assumed that she was intoxicated. Although there was a wide range in the defendant's behavior, she only became violent when she was told that she would be placed in handcuffs. The officer did not intend to charge her with a violation of a criminal law. Officer Pacheco testified as to his intention as follows:

> "I basically was going to place her in custody on a civil hold and either take her to the detox or the booking facility and another officer had to forcibly handcuff her and put her in the back seat."

There is testimony in the record that prior to the time the defendant was placed in the patrol car the officer was attempting to identify the defendant so that he could take her home. As to what he was attempting to learn after she was placed in the patrol car, Officer Pacheco testified that when he opened the purse "my sole purpose was to find out who she was."

Thus, the issue in this case narrows: Can the police without a warrant in a noncriminal and nonemergency situation search the property of an intoxicated person for identification at the time the person is taken into custody *for transportation to a treatment or holding facility?*

Neither party contends that Officer Pacheco was conducting a criminal investigation at the time he opened the purse. We agree with the Court of Appeals that the facts of this case did not present the officer "with a medical emergency justifying an immediate search." *State v. Newman, supra,* 49 Or App at 320. The defendant was suffering from ordinary intoxication from the use of alcohol. The search was a search of the defendant's property and not a search of her person. *State v. Brown,* 291 Or 642, 634 P2d 212 (1981), 2 LaFave, Search and Seizure 347 (1978).

This case boils down to a question of reasonableness. *State v. Tourtillott,* 289 Or 845, 618 P2d 423 (1980). Was it reasonable for Officer Pacheco to invade the

---

We note that ORS 426.460 does not define "treatment facility." *See* ORS 426.460(7) and Legislative Counsel's Note: Oregon Laws 1973, ch 795, 2 and 3; and Oregon Laws 1979, ch 744.

defendant's privacy by opening her purse to find out who she was prior to taking her to a treatment or holding facility? We find that the officer's act was not reasonable under the circumstances of this case.

The purpose of a purse or handbag is to carry personal things. An individual's expectation of privacy in a purse is probably greater than in any other property except the clothing worn by a person. We do not think it was necessary for the police officer to know the name of the person that he was going to transport to the treatment or holding facility. The officer could have transported the defendant under the name of "Jane Doe." Many of the regular clients of detoxification centers, treatment and holding facilities are known only to their peers and the police as "Shorty," "Slim," "Red," or "Little Mac."

We do not reach the question whether or not the purse of the defendant could have been searched for identification as a part of the booking procedure at the treatment or holding facility. We hold only that it was not reasonable to search the defendant's purse for identification for the purpose of transporting the defendant to the facility.[7]

The dissent seems to attempt to broaden the scope of this case. It seems to assume that the police have statutory authority not only to take an intoxicated person home or to a treatment facility, but that the statute extends to taking a person into custody for that purpose by compulsion, i.e., without the person's assent and over her protests, even when the person is not "incapacitated" and there is no danger to her health or to any other person within the second sentence of ORS 426.460(1), *supra*. This assumption gives rise to a set of constitutional problems inherent in a "seizure" of a person for a non-penal purpose, including problems of the applicability and meaning of "probable cause," which we do not reach here.

We repeat that this case involves a nonemergency as well as noncriminal situation. We have held that only

---

[7] As far as we know, this is the first appellate case in Oregon to deal with the search of the property of intoxicated persons since the Oregon legislature enacted ORS 426.460 in 1971. Cases from other jurisdictions are of very little help. *See* generally 85 ALR 3d 701.

the search of the purse is at issue here, not the officer's investigation of her physical condition and whatever "stop" this may have involved.

The dissent states that the officer had probable cause to arrest the defendant. We shall assume, for the sake of argument, that the dissent is correct, but the fact remains that the officer did not act upon that probable cause. Officer Pacheco did not arrest the defendant at any time prior to the search of the closed purse or the wallet found within the purse and therefore the search of those containers cannot be justified as incident to arrest.[8]

The dissent urges that because the officer had the legal authority to take the defendant as an intoxicated person into custody for transportation to her home or a treatment facility, it was reasonable for him to attempt to learn her identity. For the sake of argument, we will also assume that is correct. The dissent then states that by taking her into custody the officer had completely deprived her of her liberty. That seems obvious. The dissent further states that the officer, by taking her into custody, had completely deprived her of her privacy and from that argues that it was therefore reasonable to conduct, without her consent, a search of her purse and wallet to learn her identity. We cannot accept the proposition that by exercising authority to take the defendant into custody as an intoxicated person the officer had completely deprived her of her privacy. The dissent's ultimate conclusion is based on that premise.

The dissent's argument is really nothing more than the following: (1) The officer took the defendant into custody pursuant to authority to take an intoxicated person into custody for transportation to her home or a treatment facility. (2) The officer thereby "completely" deprived her

---

[8] Even in the context of a criminal case it would have been questionable whether the police could have searched the defendant's purse without a warrant. The purse lay on the ground outside of the defendant's vehicle. It was a search of property and not a search of the defendant's person. *State v. Brown,* 291 Or 642, 634 P2d 212 (1981), 2 LaFave, Search and Seizure 347 (1978). It was not in the vehicle and therefore *New York v. Belton,* 453 US 454, 101 S Ct 2860, 69 L Ed 2d 768 (1981) did not apply. The purse was in no man's land somewhere between *United States v. Robinson,* 414 US 218, 94 S Ct 467, 38 L Ed 2d 427 (1973) and *United States v. Chadwick,* 433 US 1, 97 S Ct 2476, 53 L Ed 2d 538 (1977).

of her privacy. (3) Since the officer had already completely deprived her of her privacy, it was reasonable for him to search her closed purse and wallet to learn her identity. We simply do not agree with that line of reasoning.

The dissent cites case law to support the above argument pertaining to an arrest situation. This was not an arrest situation. Even if it were, the authority to search these closed containers in the circumstances here presented would be questionable. *See n. 8, supra.*

The part of the dissent concerning the defendant's age and sex is window dressing. A "19-year-old woman" is just as much an adult as is a middle aged male-person. ORS 109.510. The testimony does not reveal any basis for the officer to conclude that this adult person lived with her parents. This adult person had expressed in no uncertain terms that she did not wish her parents to be notified. She even told the officer to take her wherever he wanted rather than the alternative of calling her parents. The dissent does not make it clear why the law is to treat this adult differently than any other adult in the same or similar circumstances.

The dissent takes us to task for limiting the operation of this opinion to these facts and thinks that we hedged when we said that we did not reach the question of searching the purse as a part of the booking procedure. The concept of dealing with intoxicated persons in a noncriminal setting is new in Oregon. The test of each step in the police procedure is reasonableness. We see no need to fill these pages with dictum. We also did not reach the questions of whether or not the police could have searched the purse for the purpose of taking the defendant to her home as opposed to taking her to a treatment or holding facilty or whether or not the officer could have searched her person as an incident of taking her into civil custody. It was not necessary to decide those questions.

Reversed.

**TANZER, J.,** dissenting.

Today this court holds that it is constitutionally unreasonable for a police officer who takes an intoxicated 19-year-old from her automobile into civil custody after she

gives false information as to her identification, to look in her wallet to find out who she is and where she lives. I think the officer's action was reasonable. I think most people, judges or not, who are concerned about the welfare of their families and friends, particularly in a society beset with problems of alcohol and drug abuse, would also consider it reasonable. For this court to hold the officer's action to be constitutionally barred and the results subject to suppression in order to deter future similar police illegality is unreasonable. Understandably, the majority has cited no law, principle or precedent that actually supports its holding and I am aware of none.

The officer was acting under the authority of ORS 426.460(1):

> "Any person who is intoxicated or under the influence of controlled substances in a public place may be taken or sent home or to a treatment facility by the police. However, if the person is incapacitated, the health of the person appears to be in immediate danger, or the police have reasonable cause to believe the person is dangerous to self or to any other person, the person shall be taken by the police to an appropriate treatment facility. * * *"

This statute was enacted as a reform, superseding so-called "status crimes" such as "public intoxication," which were invalidated in cases such as *Robinson v. California,* 370 US 660, 82 S Ct 1417, 8 L Ed 2d 758 (1962), and particularly *Powell v. Texas,* 392 US 514, 88 S Ct 2145, 20 L Ed 2d 1254 (1968). The theory of the entire legislation was that intoxication without more should be dealt with by the state as a civil problem. The state was to be helper or protector of the afflicted and no longer prosecutor of the criminal. There is some contemporary dubiety about the state's role as helper or protector, but that is nevertheless the hopeful intent of the legislation. Looking at the facts in light of the statute, this officer's conduct was lawfully authorized.

In the early morning hours, the police officer came upon an intoxicated young woman in a parked automobile who gave him an operator's license which he had reason to believe was not her own and a home telephone number which he learned was not her own. The officer had probable cause to arrest her for both the crime of use of a false

operator's license and, possibly, for driving under the influence of intoxicants. He also had legal authority to take her to her home or to a treatment facility and to take her into custody for those purposes. He did not arrest her for either of these crimes. His decision to take civil action when he could lawfully have taken the more severe course of a criminal arrest is an indication of the reasonableness of the officer's action. Upon taking her into custody on either basis, criminal or civil, it was reasonable for the officer to take action to learn the identity of the person. Having completely deprived that person of liberty and privacy by taking her into custody, it was also reasonable for the officer to look for evidence of identity in a place where such evidence is likely to be found, *i.e.,* a wallet or purse. We so held in the arrest case of *State v. Florance,* 270 Or 169, 527 P2d 1202 (1974) (expressly overruling *State v. O'Neal,* 251 Or 163, 444 P2d 951 (1968), which barred an officer doing so at the time of arrest). That look was a negligible increment to the loss of privacy the person already suffered.

It may not be essential for the officer to know the identity of the person he is taking into custody, but it is certainly reasonable. The officer and the governmental entity which he represents would reasonably want to have a record of the identity of the person seized if they are later sued for false arrest. Also, it is reasonable for the police to want to know who the person is in case she were to escape from custody. It is true that the police sometimes shelter derelicts with no known identity, but this defendant is not a derelict, and one optimistic purpose of the law is to help prevent her becoming one. She is a 19-year-old woman and an object of the law is to provide some protection for her. It is reasonable for the police to be able to consider taking her home or calling her parents to take her home, for example, as ORS 426.460 authorizes, regardless of whether she wants them called. That requires that the police know her identity and it is reasonable for them to take action toward that end.

The majority purports to limit the application of the opinion to these facts. It would hold that it is unreasonable for an officer to search for identity when taking a person into custody, but it leaves open whether the same action would be reasonable when the person is booked into

some facility. *Cf. State v. Brown,* 291 Or 642, 634 P2d 212 (1981). This is an invented distinction with no theoretical foundation and the majority offers no legal support for it. Custody involves a loss of liberty and privacy to the degree reasonably required for purposes of custody. It is not a significantly greater intrusion on privacy to find out who the person is. The controlling fact is custody itself, not whether the custody is on the street or five minutes later at a holding facility. Once custody is established, it makes no difference whether the custodial officer is the arresting officer or a jailer and whether the place of custody is a police car or a building. *See, United States v. Robinson,* 414 US 218, 94 S Ct 467, 38 L Ed 2d 427 (1973), and *Gustafson v. Florida,* 414 US 260, 94 S Ct 488, 38 L Ed 2d 456 (1973). The police either can or cannot reasonably look in a pocket or purse to determine the identity of a person in custody. I would hold they can. To hedge as the majority does raises a distinction without a difference which betrays the majority's lack of conviction in the rationale. The majority decides who wins, but it does not deal with the law of custody.

I dissent. Tongue and Peterson, Judges, join in this dissent.